TODD KIM
Assistant Attorney General
MARISA J. HAZELL
marisa.hazell@usdoj.gov
Trial Attorney, CO Bar No. 54272
United States Department of Justice
Environment & Natural Resources Division
Indian Resources Section
999 18th St., South Terr. 370
Denver, CO 80202
TEL:  (202) 532-3055
FAX: (202) 353-1156
LAURA BOYER
laura.boyer@usdoj.gov
Trial Attorney, CO Bar No. 56764
United States Department of Justice
Environment & Natural Resources Division
Indian Resources Section
999 18th St., South Terr. 370
Denver, CO 80202
TEL:  (202) 353-8596
FAX: (202) 353-1156

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT FOR
THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 5:23-cv-02295 |
| v. | ) | |
| | ) | |
| STEVEN P. GOULD, | ) | |
| Defendant. | ) | |
| | ) | |

1

## **COMPLAINT**

The United States of America, by authority of the Attorney General of the United States and at the request of the United States Department of the Interior, acting on its own behalf and as trustee for the Colorado River Indian Tribes ("Tribes" or "CRIT"), files this complaint and alleges as follows:

## **NATURE OF ACTION**

1.    This is a civil action brought pursuant to the federal common law of trespass and ejectment to remedy Steven Patrick Gould's ("Defendant") intentional and unauthorized occupancy and use of lands that the United States owns in trust for the benefit of the Tribes and that are subject to federal authority, supervision, and restrictions against alienation.

2.    Defendant has repeatedly been notified regarding this trespass and has been ordered to cease and desist. However, Defendant continues to occupy and use the subject trust lands.

3.    Defendant has unlawfully occupied and continues to unlawfully occupy a tract of land held by the United States in trust for the Tribes. Defendant has also unlawfully deprived the Tribes of their right to occupy and use that land.

4.    The United States seeks all just and proper remedies against Defendant, including, but not limited to, the following: declaratory relief;

ejectment; damages or mesne profits for the unlawful occupancy and use of the property, and for restoration and remediation of the damaged and degraded property; and all costs and fees associated with this action.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of and parties to this action pursuant to 28 U.S.C. §§ 1331, 1345.

6.     Venue properly lies in this judicial district, pursuant to 28 U.S.C. § 1391(b), because the subject property, defined in paragraph 8 below, is in the judicial district and all the alleged acts occurred in the judicial district.

## PARTIES

7.     Plaintiff is the United States of America suing on its own behalf and in its capacity as trustee for the Tribes.

8.     Defendant is an individual who has occupied and continues to unlawfully occupy Lot 16 of the Rymer Subdivision ("Rymer Lot 16"), covering 156 feet of river front, with a depth averaging 212 feet, comprising an area of approximately 0.88 acres. The Rymer Lot 16 is located within Sections 23 and 24, Township 4 South, Range 23 East, of the San Bernardino Base and Meridian ("Subject Property").

9.     The lot was originally permitted to James A. Gould and Sharon E. Gould, who are since deceased. Defendant Steven P. Gould has used and occupied the Subject Property since at least 2005.

## **GENERAL ALLEGATIONS**

### **A.     The Lands at Issue**

10.     CRIT is a federally recognized Indian tribe residing on the Colorado River Indian Reservation ("Reservation"), which Congress established in 1865. Act of March 3, 1865, 13 Stat. 541, 559. The Reservation straddles the Colorado River ("River")—which serves as the Arizona-California border—with land in both Arizona and California. Originally, the entire Reservation was located to the east, or Arizona side, of the River. The Reservation was subsequently expanded by Executive Orders dated November 22, 1873; November 16, 1874; May 15, 1876; and November 22, 1915.

11.     In 1964, Congress affirmed the CRIT Reservation as established and expanded by Executive Order, providing that "unallotted lands of the . . . Reservation . . . are . . . tribal property held in trust by the United States for the use and benefit of [CRIT]." Pub. L. No. 88-302, 78 Stat. 188, 189 (April 30, 1964) ("1964 Act"). The 1964 Act authorized the Secretary to approve leases of lands on the Reservation, but it initially held in abeyance the Secretary's leasing

1    authority on lands on the California side of the River until such time that those

2    lands were "determined to be within the reservation." Pub. L. No. 88-302, Sec. 5.

3        12.    On January 17, 1969, the Interior Solicitor Edward Weinberg issued

4    a legal opinion in which he determined that the western boundary of the

5    Reservation included a portion of Riverside County, California. Exhibit 1,

6    Memorandum from the Secretary of the Interior to BLM Director (January 17,

7    1969). The Secretary of the Interior, Stewart Udall, concurred in the opinion and

8    instructed the Director of the Bureau of Land Management ("BLM") to suspend

9    certain surveys and reinstate others to fix the line of the western boundary of the

10   Reservation. January 17, 1969, Memorandum from the Secretary of the Interior

11   to the Director, Bureau of Land Management ("1969 Secretarial Order").

12       13.    In 1970, the Secretary of the Interior, Walter Hickel, confirmed

13   Secretary Udall's "final, official and unqualified declaration that the 'Benson

14   Line' was the proper location of the western boundary of the Reservation."

15   Exhibit 2, Letter from the Secretary of the Interior to CRIT Chairman (June 2,

16   1970).

17       14.    The Bureau of Indian Affairs ("BIA") then published a notice in the

18   Federal Register that extended the Colorado River Reservation Indian leasing

19   program to "those lands which the Secretary of the Interior has determined,

pursuant to the Act of April 30, 1964 (78 Stat. 188), to be within the Colorado River Reservation." Certain California Lands Determined to Be Within the Colorado River Reservation, 35 Fed. Reg. 18,051 (Nov. 25, 1970).

15.    The Subject Property, identified administratively by the BIA as Lot 16 of the Rymer Subdivision, is situated in a portion of the San Bernardino Base and Meridian, Township 4 South, Range 23 East, Section 23 and 24. The Subject Property is within the exterior boundaries of the lands determined to be within the Colorado River Indian Reservation as noticed in the Federal Register on November 25, 1970.

**B.    Defendant's Unauthorized Occupation and Use of Subject Property**

16.    After the November 25, 1970, Federal Register notice, the BIA began approving permits to occupy the Reservation lands located west of the Colorado River, including the permit for the Subject Property.

17.     CRIT utilized standard-form permits that were approved by the *Resources Development Committee* (RDC), a subcommittee of CRIT's Tribal Council. Each permit was captioned with "Permit No. WB-[XXX](R) Western Boundary Permit," with "Permit (Homesite)" written below.

1    18.    The Articles included therein identify the parties, describe the

2  premises, state the terms of the permit, and list the rental amounts to be paid. The

3  permits identify CRIT as the permitter and include signature lines for the

4  Permittee, the Tribal Chair, Tribal Secretary, and the BIA Superintendent.

5    19.    Once a permit was executed, it was delivered to BIA's Land, Titles,

6  and Records Office for recordation. A recorded permit contained a nine-digit

7  record number beginning with 603. That number was stamped in black ink and

8  placed in the lower righthand corner of each page. Once the BIA received a

9  permit, it stamped the first and last page with ink, noting the permit was received

10  and identifying the date, time, and location of the receiving BIA office.

11    20.    On December 26, 1979, CRIT issued Permit No. WB-67(R) to James

12  A. Gould and Sharon E. Gould. Exhibit 3 at 13, Permit No. WB-67(R)

13  ("Permit"). The Permit was approved by the BIA Superintendent of the Colorado

14  River Agency ("Superintendent") on January 8, 1980. *Id.* Article 2 of the Permit

15  states that the Subject Property is "within the Colorado River Indian

16  Reservation." *Id.* at 1–2. Article 3 of the Permit states that the Subject Property is

17  authorized for "use and occupancy by the Permittee . . . and their immediate

18  family only, for single family residential occupancy." *Id.* at 2.

7

21.     Article 4 of the Permit states that it "may be terminated at the end of the initial [one-year] term or at the end of any such successive one-year period by written notice served by the Secretary or the Permittee at least ninety (90) days in advance thereof." *Id.*

22.     Article 5 of the Permit states that "[t]he Permittee . . . covenants and agrees to pay . . . the amount herein set out . . . or as may be adjusted from time to time" and that "if any installment or rental is not paid on or before the due date, interest at the rate of 12 percent per annum shall become due and payable and will run until said rental is paid." *Id.* at 2–3. At the time of signing, annual rent was $822.12. *Id.* at 3.

23.     Article 6 of the Permit prohibits the Permittee from placing "permanent improvements" on the Subject Property without first obtaining written consent from CRIT. *Id.* at 3.

24.     Article 15 of the Permit states that "Permittee understands and agrees that this permit shall not be deemed to confer upon Permittee any equity right, title or interest to or in the permitted lands, and further, Permittee hereby relinquishes all past, present or future claims of right, title or interest in, the lands held under this permit or any other lands within the Colorado River Indian Reservation . . . ." *Id*. at 9.

8

25.    Article 18 of the Permit states that:

Should Permittee default in the payment of any installment or rent or

any other sum when due . . . the Secretary . . . may declare this permit

forfeited by giving Permittee written notice thereof, and upon such

forfeiture, Permittee shall have no further rights or interest hereunder

or in or to the permitted premises or any part thereof, and Permitter

may re-enter and take possession of the permitted premises and all

buildings and improvements thereon, and may cast Permittee and all

persons claiming under the permit from the premises.

*Id.* at 10.

26.    Article 22 of the Permit states that "[h]olding over by the Permittee after the termination of this permit shall not constitute a renewal or extension hereof or give the Permittee any rights hereunder or in or to the Permitted premises." *Id.* at 11.

27.    Article 25 of the Permit states that the Permit "and the covenants, conditions, and restrictions hereof shall extend to and be binding upon the successors, heirs, assigns, executors, and administrators of the parties hereto." *Id.* at 12.

28.     Article 27 of the Permit states that "[s]ubletting or assignment of this permit may be made only with the written consent of all the parties hereto." *Id.*

29.     On September 10, 1982, the BIA notified James and Sharon Gould via letter that the annual rental payment amounts for Permit WB-67(R) would be increased from $822.12 to $2,227.68. *See* Exhibit 4, Letter from BIA to Gould September 10, 1982. The new rental payment amount would be due on or before January 1, 1983. *See id.* On September 24, 1985, the BIA notified James and Sharon Gould that annual rental payment amounts for Permit WB-67(R) would be increased again to $3,712.80. *See* Exhibit 5, Letter from BIA to Gould September 24, 1985. The new rental payment amount would be due on or before January 1, 1986. *See id.*

30.     On March 31, 1987, James and Sharon Gould, with the agreement of CRIT, modified the Permit to assign the downriver half of the lot (identified as "Lot 17") to Hugh and Crisandra Barden under a new permit, Permit No. WB-353(R). *See* Exhibit 6 at 1–2, WB-67(R) Permit Modification and Map (April 15, 1987). James and Sharon Gould retained the upriver portion of the lot, still titled Lot 16, which after the modification, covered 76 feet of river front with a depth averaging 224 feet, comprising an area of approximately 0.54 acres. *Id.* at 2. The

modification reduced James and Sharon Gould's annual rent from $3,712.80 to $1,839.20. *Id.* at 2. BIA approved the modification on August 25, 1988. *Id.* at 1.

31.    On October 23, 1991, CRIT notified James Gould via letter that the annual rental payment amounts for Permit WB-67(R) would be increased by "$45.00 per river front foot" for river front lots, increasing the annual rent of the modified Lot 16 from $1,839.20 to $3,420. *See* Exhibit 7, Letter from CRIT to Gould (October 23, 1991).[1]

32.    James and Sharon Gould made full rental payments from December 1979 to December 1992. *See* Exhibit 8 at 1, Letter from CRIT to Gould (June 24, 1994). In 1993, James and Sharon Gould paid only $1,080 of the $3,420 owed. *Id.* at 3. In 1994, James and Sharon Gould paid only $285 of the $3,420 owed. *Id.*

33.    On June 24, 1994, CRIT notified James Gould that the Goulds were in violation of the Permit under Article 5 for failure to pay the full rental amount. *Id.* CRIT notified James Gould that the Goulds owed a total of $6,096.00, which

---

[1] CRIT's letter states that the rental increase will be calculated as $45 per river front foot for all river frontage lots. The Gould's modified Lot 16, a river frontage lot, consisted of 76 feet of river front property. Based on this, the new increased annual rent price was calculated to be $3,420.

1    included unpaid rent from 1993 and 1994 as well as interest calculated at 12

2    percent per annum as required by the Permit. *Id*. The letter further stated that

3    they had "ten (10) days . . . to show cause why [the Permit] should not be

4    cancelled" or CRIT would proceed with remedies such as "immediate

5    cancellation [of the Permit]." *Id.* James and Sharon Gould did not respond to the

6    June 24, 1994 Letter.

7        34.    James and Sharon Gould subsequently failed to make any rental

8    payments in 1995. *See* Exhibit 9 at 1, Letter from CRIT to Gould (November 30,

9    1995).

10        35.    On November 30, 1995, CRIT sent another letter, notifying James

11    Gould of the Gould's failure to pay "the full rental of $3,420 for each lease year,

12    1993, 1994 and 1995." *Id*. The letter notified James Gould that the Goulds owed

13    a total of $8,895.00, including unpaid rent and interest. *Id.*

14        36.    On August 9, 1996, the BIA Phoenix Area Director notified James

15    and Sharon Gould that the Permit was "declared forfeited and [was] terminated

16    effective immediately," in accordance with Article 18 of the Permit, for failure to

17    pay rent for 1993, 1994, 1995, and 1996. Exhibit 10 at 1, Letter from BIA to

18    James Gould (August 9, 1996). The Area Director notified James and Sharon

19    Gould they owed $12,315.00 in back rent plus interest at 12 percent per annum.

*Id.* The Area Director ordered the removal of personal property from the Subject

Land within 30 days from receipt of the letter, but no later than September 12,

1996. *Id.* James and Sharon Gould did not pay back rent or interest and

continued to occupy the Subject Property.

37. Upon information and belief, the Permit for the Subject Property was

signed over to Steven P. Gould by James and Sharon Gould in 2005, at which

time Steven P. Gould began occupying the Subject Property. *See* Exhibit 11,

CRIT Assessment Sheet for Rymer Lot #16.

38. On January 5, 2007, Sharon E. Gould passed away. *See id.*

39. On September 1, 2010, CRIT posted a Notice on the Subject

Property that informed the occupants that the Permit for the property had been

terminated since August 9, 1996 for failure to pay rent. *See* Exhibit 12, Notice

(September 1, 2010). The Notice also informed occupants of the Subject

Property that they did not have a valid lease with CRIT, were in trespass on trust

land, and needed to contact the CRIT Attorney General to make arrangements to

pay back rent and sign a lease to stay on the property lawfully. *Id.* Lastly, the

Notice notified the occupants that if they failed to make such arrangements by

September 30, 2010, CRIT would take legal action to remove the occupants from

the Subject Property. *Id.* Defendant failed to comply or vacate the Subject Property.

40.     On March 23 and March 24, 2011, CRIT attempted to contact James Gould. Exhibit 11, CRIT Assessment Sheet for Rymer Lot #16. James Gould hung up when he learned the caller was from CRIT and refused to answer further calls. *Id.*

41.     On August 13, 2012, Andrea Vernoy, CRIT Lease Specialist, sent a letter to James Gould, copying Defendant Steven Gould, stating that CRIT would waive default interest on back rent if the Goulds signed a new lease and paid past rent due. *See* Exhibit 13 at 1–2, Letter from Vernoy to James and Steven Gould (August 13, 2012). Vernoy also offered them the option to "walk away" from the Subject Property if they vacated and turned over all property to CRIT. *See id.*

42.     Neither James nor Steven Gould entered a new lease or paid back rent, nor did either of them choose the walk-away option. Upon information and belief, they instead continued to occupy and use the Subject Property without authorization or permission.

43.     On information and belief, tribal officials have periodically observed and inspected the Subject Property and observed that Defendant continues to illegally occupy the premises.

44.    Defendant's unlawful use and occupation of the Subject Property without a lease has been and continues to be knowing, intentional, willful, and contrary to federal law, and it has deprived the Tribes and Plaintiff of the use and enjoyment of that land to which they are entitled.

**C.    Legal Basis for Claims against Defendant**

45.    The federal common law of trespass "generally comports with the Restatement of Torts," *United States v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009), under which trespass is defined as "the intentional use of the property of another without authorization and without privilege," *United States v. Imperial Irr. Dist.*, 799 F. Supp. 1052, 1059 (S.D. Cal. 1992). Further, "[t]he intent required is simply an intent to be on the land." *Id*.

46.    Under federal common law, remedies for trespass include declaratory relief, damages, and ejectment. *See United States v. Pend Oreille Pub. Util. Dist. No. 1*, 28 F.3d 1544, 1549 n.8 (9th Cir. 1994); *United States v. Torlaw Realty, Inc.*, 483 F. Supp. 2d 967, 973 (C.D. Cal. 2007), *aff'd*, 348 Fed. Appx. 213 (9th Cir. 2009). As stated by the United States Supreme Court, "that an action of ejectment could be maintained on an Indian right to occupancy and use, is not open to question." *Marsh v. Brooks*, 49 U.S. 223, 232 (1850).

47.    Moreover, residential leases on Indian land are governed, generally, by 25 C.F.R. Part § 162. The Permit is a residential lease and is thus governed by these regulations.

48.    The BIA's leasing regulations define a trespass as "any unauthorized occupancy, use of, or action on any Indian land or government land." 25 C.F.R. § 162.003.

49.    Defendant is required to have a lease to occupy and use such property on the Reservation. 25 C.F.R. § 162.005.

50.    When a lessee remains in possession after a residential lease is terminated, the BIA may treat the unauthorized possession as a trespass and take action to recover possession and pursue any additional remedies under applicable law. 25 C.F.R. § 162.371.

51.    Defendant has no ownership interest in the Subject Property, nor did James and Sharon Gould. And although James and Sharon Gould recognized the Subject Property's trust status by leasing it from CRIT and paying rent accordingly, Defendant does not possess a valid lease or permit for the Subject Property. Therefore, Defendant's occupancy and use of the Subject Property constitutes trespass under federal common law and governing regulations.

# **FIRST CAUSE OF ACTION**

## **(Trespass)**

52.     The United States realleges each of the preceding paragraphs as if fully set forth herein.

53.     On August 9, 1996, the BIA terminated the Permit issued to James and Sharon Gould for the Subject Property pursuant to Article 18 of the Permit, which states that:

> If the Permittee default in the payment of any . . . rent . . . when due . . . the Secretary . . . may declare this permit forfeited by giving Permittee written Notice thereof, and upon such forfeiture, Permittee shall have no further rights or interest hereunder . . . , and Permitter may . . . take possession of the permitted premises and all buildings and improvements thereon, and may cast Permittee and all persons claiming under the permit from the premises.

54.     Pursuant to Article 25 of the Permit, its terms are binding on all "successors, heirs, assigns, executors, and administrators."

55.     Lessee James and Sharon Gould continued to occupy the Subject Property without a valid lease and without payment to CRIT until at least 2005, when they purportedly transferred the property to Steven Gould.

56.    Since at least 2005, Defendant Steven Gould has willfully occupied and used the Subject Property without authorization or legal right. Despite being notified of the termination through letters dated September 1, 2010, and August 13, 2012, and being offered the opportunity to enter into a new lease with CRIT or "walk away," Defendant has not vacated the Subject Property.

57.    Defendant does not now nor has he ever possessed a valid lease, permit for, or any ownership interest in the Subject Property.

58.    Therefore, since Defendant moved onto the Subject Property, Defendant's use and occupancy of the Subject Property has constituted trespass and he has committed and is now committing continuing willful trespass on CRIT land that is subject to federal supervision, authority, and restrictions against alienation.

59.    As a direct and proximate result of Defendant's continuing and willful trespass, Defendant has damaged and continues to damage the Tribes' trust property and the governmental interests of the United States, and Defendant will continue to do so unless and until the trespass is remedied.

## SECOND CAUSE OF ACTION

### (Ejectment)

60.    The United States realleges each of the preceding paragraphs as if fully set forth herein.

61.    Since at least 2005, and without authorization or legal right, Defendant has willfully occupied and used the Subject Property.

62.    As a direct and proximate result of Defendant's unauthorized and unlawful occupation and use, Defendant has prevented and continues to prevent CRIT from occupying and using the land, which is subject to federal supervision, authority, and restrictions against alienation.

63.    Defendant has defied and continues to defy the authority of the United States, acting through the BIA, to administer the Subject Property.

64.    Defendant's continuing occupation and use of the Subject Property is unlawful and, as a direct and proximate result of that trespass, Defendant has damaged and continues to damage the Tribe's and United States' property interests. Defendant will continue to damage the Tribe's and United States' property interests until Defendant is ejected from the Subject Property, his facilities and equipment are removed, and the land is returned to its original condition.

**<ins>PRAYER FOR RELIEF</ins>**

WHEREFORE, Plaintiff, the United States of America, respectfully requests that the Court provide the following relief:

a.    Declare pursuant to 28 U.S.C. §§ 2201, 2202 that Defendant's willful, unauthorized, and continuing occupation and use of the Subject Property, without the authorization of the Tribes and United States, constitutes a continuing trespass;

b.    Enter a judgment for mesne profits or monetary damages caused by Defendant's willful, unauthorized, and continuing occupancy, use, and disturbance of the Subject Property accruing over the six years and 90 days from the date of filing, including, without limitation, the fair rental value of the property, administrative costs, and the costs and expenses of restoring and remediating the damaged and degraded property;

c.    Enter a judgment for pre- and post-judgment interest on all damages awarded from the date of filing of this Complaint until the Judgment is paid in full;

d.    Eject Defendant from the Subject Property;

e.    Order Defendant to remove from the Subject Property any and all equipment, personal property, buildings, and other materials placed thereon by them, and abate any damage caused to the Subject Property necessary to restore the property to its natural condition, or in the alternative, authorize the United States to

1    undertake these tasks, with all costs and expenses incurred by the United States to

2    be paid by Defendant;

3        f.        Award the United States all costs of suit to the maximum extent

4    permissible; and

5        g.        Grant such other and further relief as the Court deems just and proper.


DATED:  November 7, 2023


                                Respectfully submitted,


                                TODD KIM
                                Assistant Attorney General

                                _/s/ Marisa J. Hazell_____
                                MARISA J. HAZELL
                                Trial Attorney, CO Bar No. 54272
                                marisa.hazell@usdoj.gov
                                LAURA BOYER
                                Trial Attorney, CO Bar No. 56764
                                laura.boyer@usdoj.gov

                                United States Department of Justice
                                Environment & Natural Resources Division
                                Indian Resources Section

OF COUNSEL

Michael Bianco
Shani N. Sumter
Karen F. Boyd
Victoria A. Cejas
United States Department of the Interior
Office of the Solicitor
Indian Trust Litigation Office